OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 In order to ensure an honest marketplace, the General Business Law prohibits all deceptive practices, including false advertising, “in the conduct of any business, trade or commerce or in the furnishing of any service in this state” (General Business Law § 349 [a]; § 350; Governor’s Approval Mem, L 1970, ch 43, 1970 McKinney’s Session Laws of NY, at 3074). This appeal requires us to determine whether plaintiffs can maintain
 
 *288
 
 an action against defendants operating an
 
 in vitro
 
 fertilization (IVF) program for deceptive practices and false advertising under General Business Law §§ 349 and 350, or are instead limited to a claim for medical malpractice based on lack of informed consent. We hold that plaintiffs have properly stated causes of action under these consumer protection statutes, and are not precluded from pursuing those claims because the alleged misrepresentations relate to the provision of medical services.
 

 Facts
 

 In 1987, plaintiffs Jayne and Kenneth R. Karlin sought evaluation and treatment from defendants’ IVF program. The IVF procedure involves removal of multiple eggs from a woman’s ovaries, fertilization of the eggs outside her body and transfer of the fertilized eggs to her uterus in an attempt to impregnate her (see,
 
 Kass v Kass,
 
 91 NY2d 554, 557). Over the course of 2½ years, Mrs. Karlin completed seven IVF cycles at defendants’ clinic but did not become pregnant.
 

 In 1990, the Federal Trade Commission (FTC) charged IVF America and related entities (IVF America) with deceptively advertising and promoting its program, finding the following statements typical of representations in their promotional materials:
 

 “1. ‘likely treatment outcomes . . . Our experience indicates that when a patient at an IVF [America] Program completes four IVF treatment cycles, the chance of giving birth is about 50%. * * * If
 
 25
 
 women begin a total of
 
 100
 
 IVF cycles . . . About
 
 13 (or
 
 about 50%) of the women give birth to
 
 18
 
 babies’ (emphasis in original) * * *.
 

 “2. ‘[M]ore than 28% of the couples who complete a cycle of treatment are becoming pregnant’ * * *.
 

 “3. ‘[0]ne out of three couples who complete a cycle of treatment is becoming pregnant.’ ”
 

 According to the FTC, these statements were misleading because women who participate in IVF America’s treatment program “consisting of four IVF cycles have considerably less than a 50 percent chance of giving birth,” and women who par
 
 *289
 
 ticipate in IVF America’s treatment program “consisting of one IVF cycle have considerably less than a 28 to 33 percent chance of becoming pregnant.” By consent decree dated December 31, 1990, IVF America agreed to cease and desist from misrepresenting success rates, and also agreed in the future to disclose the basis used for calculating the percentage of patients who have become pregnant or given birth.
 

 In February 1993, however, the ABC News program “20/20” televised an investigative report on the IVF industry in which IVF America employees were shown informing prospective patients that after four to six cycles, IVF America had pregnancy success rates “between 60 to 80 percent.” The report also showed an IVF America representative telling a seminar participant that there are “[absolutely not” any long-term effects of the IVF procedure. This report prompted New York City’s Department of Consumer Affairs to charge IVF America with violations of the City’s Consumer Protection Law. As part of a settlement reached in April 1993, IVF America agreed to refrain both from marketing its services using unsubstantiated pregnancy success rates and from stating that IVF procedures posed no adverse health risks.
 

 The following year, plaintiffs commenced this action alleging that defendants engaged in fraudulent and misleading conduct by disseminating false success rates and misrepresenting health risks associated with IVF. In particular, plaintiffs claim that defendants “exaggerated success rates, excluding certain subsets of failed treatment procedures, emphasizing numerically false and misleading overall success rates and concealing] and misrepresenting] significant health risks, high miscarriage rates and excessive neonatal deaths and abnormalities of infants even if a birth resulted from the treatment rendered by defendants.”
 

 Supreme Court dismissed all of plaintiffs’ causes of action except those alleging unfair and deceptive trade practices in violation of General Business Law § 349, false advertising in violation of General Business Law § 350 and lack of informed consent in violation of Public Health Law § 2805-d. In a separate order, Supreme Court denied plaintiffs’ motion for class action certification. On appeal, the Appellate Division dismissed plaintiffs’ General Business Law §§ 349 and 350 claims, categorically refusing to apply “the consumer fraud statutes to the providers of medical services” in order to prevent what the court perceived as “a drastic change in basic tort law where the Legislature has not explicitly expressed its intent to effect
 
 *290
 
 such a change”
 
 (Karlin v IVF Am.,
 
 239 AD2d 560, 561). The Appellate Division separately affirmed Supreme Court’s denial of plaintiffs’ motion for class action certification.
 

 After the case returned to Supreme Court, defendants successfully moved for summary judgment on the sole remaining claim — for lack of informed consent — on the ground that it was time-barred. Plaintiffs then moved for leave to appeal to this Court, seeking review of the two earlier, nonfinal Appellate Division orders (CPLR 5602 [a] [1] [ii]). Because the Appellate Division order affirming the denial of plaintiffs’ motion for class action certification does not necessarily affect the final judgment, this Court may not review the class action order. By contrast, the Appellate Division order dismissing plaintiffs’ General Business Law §§ 349 and 350 claims and affirming the dismissal of five other claims does necessarily affect the final judgment. Thus, we may review this order.
 

 We now conclude that plaintiffs may pursue their General Business Law §§ 349 and 350 claims, and accordingly modify the Appellate Division order brought up for review and the judgment appealed from by denying defendants’ motion to dismiss these two causes of action.
 

 Analysis
 

 Pursuant to General Business Law § 349 (a), it is unlawful to perform “[djeceptive acts or practices in the conduct of
 
 any
 
 business, trade or commerce or in the furnishing of
 
 any
 
 service in this state” (emphasis added). The scope of General Business Law § 350 is equally broad, prohibiting the promulgation of “[fjalse advertising in the conduct of
 
 any
 
 business, trade or commerce or in the furnishing of
 
 any
 
 service in this state” (emphasis added). Advertising is “false” if it “is misleading in a material respect” (General Business Law § 350-a [1]).
 

 These statutes on their face apply to virtually all economic activity,
 
 *
 
 and their application has been correspondingly broad
 
 (see, e.g., People v Appel,
 
 258 AD2d 957 [editing business];
 
 Griffin-Amiel v Terris Orchestras,
 
 178 Misc 2d 71 [wedding singer];
 
 Baker v Burlington Coat Factory Warehouse,
 
 175 Misc 2d 951 [clothing retailer];
 
 Perez v Hempstead Motor Sales,
 
 173 Misc 2d 710,
 
 affd
 
 176 Misc 2d 314 [automobile dealer];
 
 *291
 

 People v Lipsitz,
 
 174 Misc 2d 571 [magazine subscription seller]). The reach of these statutes “provide[s] needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in our State” (NY Dept of Law, Mem to Governor, 1963 NY Legis Ann, at 105).
 

 When section 349 was enacted in 1970, only the Attorney General was empowered to enforce it (General Business Law § 349 [b]). It soon became clear, however, that the “broad scope of section 349, combined with the limited resources of the Attorney General, [made] it virtually impossible for the Attorney General to provide more than minimal enforcement” (Mem of Assemblyman Strelzin, L 1980, ch 346, § 1, 1980 NY Legis Ann, at 146). Accordingly, in 1980 the statute was amended to provide a private right of action
 
 (see,
 
 L 1980, ch 346, § 1). Among the remedies available to private plaintiffs are compensatory damages, limited punitive damages and attorneys’ fees (General Business Law § 349 [h]).
 

 A blanket exemption for providers of medical services and products is contrary to the plain language of the statutes. Such an exemption is also contrary to legislative history, as supporters of the consumer protection bills recognized that consumers of medical services and products might be particularly vulnerable to unscrupulous business practices. In fact, in a memorandum to the Governor advocating section 350, the only example cited by the Attorney General to underscore the need for such legislation was an Arthritis and Rheumatism Foundation report concluding “that through fraudulent advertising people suffering from such painful diseases as arthritis are being duped out of 250 million dollars annually” (NY Dept of Law, Mem to Governor, 1963 NY Legis Ann, at 105-106).
 

 Indeed, while the question before us is a novel one, General Business Law §§ 349 and 350 have long been powerful tools aiding the Attorney General’s efforts to combat fraud in the health care and medical services areas. The Attorney General has relied on these provisions to challenge deceptive and fraudulent practices in contexts as diverse as the marketing of AIDS-related products
 
 (People v Overs Enters.,
 
 Sup Ct, Westchester County, Colabella, J., index No. 16221/92); baldness treatments
 
 (People v D.J. Carlisi,
 
 Sup Ct, NY County, Ostrau, J., index No. 41189/89); abortion counseling clinics
 
 (People v Northern Westchester Putnam Assistance to Mother & Unborn Child,
 
 Sup Ct, Dutchess County, Beisner, J., index No. 92-135); hearing aids
 
 (People v Tolbert,
 
 Sup Ct, Clinton County, Dawson, J.,
 
 *292
 
 index No. 35678/97); and the therapeutic benefits of adjustable beds and chairs
 
 (People v Craftmatic
 
 /
 
 Contour Org.,
 
 Sup Ct, NY County, Friedman, J., index No. 41535/91)
 
 (see also, Sterling v Ackerman,
 
 244 AD2d 170 [private plaintiff sued physician for violation of section 349 to recover fees paid in excess of amounts allowed by Federal and State Medicare limiting charge statutes]).
 

 Not only is the categorical exemption crafted by the Appellate Division at odds with the language and history of sections 349 and 350, but also the apparent simplicity of that excision proves elusive when it is necessary to decide who is a “provider of medical services.” IVF America, for example, is a publicly traded company engaged in managing and providing services to clinical facilities and physician practices that specialize in infertility treatments; actual patient medical care, however, is furnished by affiliated medical institutions or groups. Thus, it is unclear whether such an entity could itself even be considered as a “provider of medical services.”
 

 Despite the scope of General Business Law §§ 349 and 350 and the historical use of these statutes to combat fraud in the medical context, defendants argue that plaintiffs’ claims must be governed exclusively by New York’s informed consent statute, Public Health Law § 2805-d. A suit for medical malpractice based on a lack of informed consent is meant to redress a “failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical * * * practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation” (Public Health Law § 2805-d [1]). In contrast to the latitude afforded plaintiffs suing for deceptive practices and false advertising, there are numerous restrictions on a plaintiff’s ability to sue for malpractice based on a lack of informed consent. Such claims, for example, are limited to certain treatments or diagnostic procedures, require a heightened showing of causation, and are subject to several affirmative defenses and an abbreviated Statute of Limitations
 
 (see,
 
 Public Health Law § 2805-d; CPLR 214-a). These restrictions were enacted in 1975 as part of a bill intended to ensure the ability of physicians to obtain malpractice insurance coverage at reasonable rates
 
 (see,
 
 Governor’s Approval Mem, L 1975, ch 109, 1975 McKinney’s Session Laws of NY, at 1739-1740).
 

 Notwithstanding defendants’ procrustean efforts to cast plaintiffs’ deceptive acts and false advertising claims as mal
 
 *293
 
 practice claims for lack of informed consent, plaintiffs have clearly alleged conduct beyond the purview of Public Health Law § 2805-d. Plaintiffs do not merely charge that “the person providing the professional treatment” failed to disclose certain pertinent information “to the patient” (Public Health Law § 2805-d [1]). Rather, they claim that defendants’ “promotional materials, advertisements, slide presentations * * * and so-called ‘educational’ seminars” contained misrepresentations that had the effect of “deceiving and misleading members of the public.” Nor are plaintiffs’ claims limited, as defendants urge, to information provided by defendants “during the course of their medical treatment at the Program.” On the contrary, plaintiffs assert that before they started any course of treatment, defendants “deceptively lured” plaintiffs and others, including physicians who refer patients to the IVF America programs, by “deceiving and misleading” them.
 

 Defendants’ alleged multi-media dissemination of information to the public is precisely the sort of consumer-oriented conduct that is targeted by General Business Law §§ 349 and 350
 
 (Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank,
 
 85 NY2d 20, 25). By alleging that defendants have injured them with consumer-oriented conduct “that is deceptive or misleading in a material way,” plaintiffs have stated claims under General Business Law §§ 349 and 350 even though the subject of the conduct was
 
 in vitro
 
 fertilization
 
 (id.; see also, New York Univ. v Continental Ins. Co.,
 
 87 NY2d 308, 320).
 

 That a plaintiff has brought General Business Law §§ 349 and 350 claims, of course, does not foreclose additional claims for lack of informed consent. A person who is “deceptively lured into” a course of professional treatment by consumer-oriented misrepresentations may also be harmed by a doctor’s failure to disclose information required by Public Health Law § 2805-d. By the same token, the fact that a person may have a claim for lack of informed consent does not preclude a separate claim on the ground that deceptive acts or misleading advertising lured the person to the doctor’s office in the first place.
 

 In exempting providers of medical services from General Business Law §§ 349 and 350, the Appellate Division relied on two Pennsylvania Superior Court cases,
 
 Foflygen v R. Zemel, M.D. (PC)
 
 (420 Pa Super 18, 615 A2d 1345,
 
 appeal denied
 
 535 Pa 619, 629 A2d 1380) and
 
 Gotten v Merzi
 
 (397 Pa Super 148, 579 A2d 974,
 
 appeal denied
 
 528 Pa 611, 596 A2d 157). Both are readily distinguishable. While plaintiffs in
 
 Foflygen
 
 and
 
 *294
 

 Gatten
 
 complained of a doctor’s misrepresentations regarding a surgical procedure administered in the course of medical treatment, no consumer-oriented conduct was at issue in those cases. Instead, both plaintiffs claimed to have been victims of deception in a single transaction in which the only parties truly affected by the alleged misrepresentations were plaintiffs and defendants
 
 (see also, Genesco Entertainment v Koch,
 
 593 F Supp 743, 752 [since negotiations for the rental of Shea Stadium merely concerned a private contract and did not implicate the public interest, section 349 did not apply];
 
 Teller v Bill Hayes, Ltd.,
 
 213 AD2d 141, 148-149,
 
 lv dismissed in part, denied in part
 
 87 NY2d 937 [section 349 claim not available because “(t)he plaintiff has wholly failed to demonstrate that the defendants utilized any fraudulent advertisements or any other false solicitations which might induce other(s) * * * to succumb to the defendants’ alleged fraud”]).
 

 Defendants’ concern that allowing plaintiffs to sue doctors for deceptive consumer practices and false advertising may cause a tidal wave of litigation against doctors is misplaced. Because plaintiffs bringing a claim under the consumer protection statutes must demonstrate an impact on consumers at large — something that a physician’s treatment of an individual patient typically does not have — these statutes will not supplant traditional medical malpractice actions. Furthermore, as this Court has already observed, the possibility of excessive litigation under the consumer protection statutes is avoided by our “adoption of an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances”
 
 (Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank, supra,
 
 85 NY2d, at 26).
 

 Finally, the interests at stake in an action under the General Business Law are distinctly different from the interests involved in a suit for professional malpractice. Thus, while physicians providing information to their patients in the course of medical treatment may be afforded the benefits of Public Health Law § 2805-d, when they choose to reach out to the consuming public at large in order to promote business — like clothing retailers, automobile dealers and wedding singers who engage in such conduct — they subject themselves to the standards of an honest marketplace secured by General Business Law §§ 349 and 350.
 

 Plaintiffs’ remaining contention is without merit.
 

 
 *295
 
 Accordingly, the judgment appealed from and the order of the Appellate Division brought up for review should be modified, with costs to plaintiffs, by denying defendants’ motion to dismiss the first and second causes of action and, as so modified, affirmed.
 

 Judges Bellacosa, Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Judgment appealed from and order of the Appellate Division brought up for review modified, with costs to plaintiffs, by denying defendants’ motion to dismiss the first and second causes of action of the amended complaint and, as so modified, affirmed.
 

 *
 

 A categorical exemption applies to “any television or radio broadcasting station or to any publisher or printer of a newspaper, magazine or other form of printed advertising, who broadcasts, publishes, or prints the advertisement” (General Business Law § 349 [e]).